Estate of Ralph E. Day, Deceased, Ernestine B. Day Kirkpatrick, Executrix v. Commissioner. Ernestine B. Day Kirkpatrick, Formerly Ernestine B. Day v. Commissioner.
Estate of Day v. Commissioner
Docket Nos. 45520, 45521.
United States Tax Court
T.C. Memo 1955-118; 1955 Tax Ct. Memo LEXIS 220; 14 T.C.M. (CCH) 430; T.C.M. (RIA) 55118; May 12, 1955
*220 Robert Ash, Esq., Munsey Building, Washington, D.C., and Carl F. Bauersfeld, Esq., for the petitioners. A. F. Barone, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income taxes as follows: Docket No.
Year
Deficiencies
45520
1-1-46 to 5-2-46
$16,964.77
45521
1946
22,688.18 The question to be decided is the extent, if any, to which the purchase price paid by petitioners for certain citrus groves should be allocated to the cost of fruit on the trees at the time of purchase. Findings of Fact Some of the facts have been stipulated and are found accordingly. Ernestine B. Day Kirkpatrick, hereinafter sometimes called petitioner, is an individual residing in Maitland, Florida. She filed an income tax return for the taxable year 1946 with the collector for the district of Florida. Petitioner is the widow of Ralph E. Day, hereinafter called decedent, and is the executrix of his estate, which is the other petitioner herein. Decedent's income tax return for the taxable period January 1 to May 2, 1946 was filed with the collector for the district of Florida. Petitioner *221 and decedent moved to Florida from Bridgeport, Connecticut, in December 1942 because of the latter's health. They purchased a home in Maitland, Florida, consisting of approximately 12 acres of land, 8 acres of which constituted a citrus grove. Prior to December 1942, petitioner and decedent had no experience in the citrus industry. Subsequently, they began to purchase citrus groves and engage in the business of citrus farming. Between December 1942 and January 1946 they purchased the following citrus groves: the Home Grove of 8 acres; a 52-acre grove in the Conway section; the 17-acre Lake-of-the-Woods Grove and McPherson Grove; the 8-acre Fosgate Grove; the 30-acre Kent Grove; the Magarin Grove; and the 8-acre Bradshaw-Longwood Grove. Petitioner supervised the caretaking and maintenance of the various groves. During the last week in January 1945, petitioner and decedent learned that certain citrus groves, hereinafter sometimes referred to as the Harrington groves, were for sale at a total price of $320,000. A real estate agent took decedent to see the Harrington groves. Petitioner was not interested in purchasing any additional groves because she had two small children and an *222 ill husband, and realized that the burden of managing the groves would fall upon her. The Harrington groves were located on a hillside south of Horseshoe Lake in Orange County, Florida. They consisted of 258 acres. Approximately 180.79 acres were planted as citrus groves with orange trees, including Hamlins, Pineapples, Parson Browns and Valencias, tangerine and grapefruit trees. The citrus trees were approximately 20 years old and the general condition, maintenance and production of the groves were excellent. Decedent was impressed with the Harrington groves. He and petitioner discussed them with Paul Rogers of the American Fruit Growers, Inc., which operated a packing house in Maitland and which handled some of the fruit from the groves for the owner. They also discussed the groves with Al Whitmore of the Florida Citrus Credit Association, who had made a crop loan on the fruit from the groves. Each of these men gave favorable reports on the condition and production records of the groves. Rogers advised decedent that the groves were among the best that could be bought due to their excellent location and condition. In February 1945, petitioner went to see the groves several times. *223 She saw the Valencia orange crop, which is the late crop, on the trees, as it had not yet been picked. She saw the trees in bloom, and was convinced that there was an excellent bloom. She watched the bloom progress until the fruit was set on the trees in March. The seller assured her that his 1944-1945 citrus crop had earned $150,000. Petitioner and decedent decided to buy the Harrington groves because their other citrus groves had yielded them good returns; they anticipated good fruit prices in the coming year; they were impressed with the excellent crop of Valencias which they had seen in February, and with the fruit that was set on the trees in March. A statement by the seller and corroborated by the American Fruit Growers, Inc. that 80,000 boxes of fruit had been picked from the groves in the preceding year also influenced their decision to buy. On March 12, 1945, petitioner and decedent entered into a sales contract with Mary A. Harrington and B. G. Harrington to purchase the groves for $320,000 and made a cash deposit of $25,000. The contract provided for final settlement within 90 days, at which time an additional $75,000 was to be paid in cash. Deferred payments amounting *224 to $220,000 were to be made as follows: $50,000
on or before January 2, 1946
25,000
on or before July 2, 1946
50,000
on or before July 2, 1947
50,000
on or before July 2, 1948
45,000
on or before July 2, 1949 Interest on the deferred payments at the rate of 5 per cent was payable semiannually. The following provision was included in the contract: "It is understood and agreed by the parties hereto that all caretaking expense is to be borne by the purchaser as of the date of this contract and that Purchaser or his Supt. is to advise with Seller as to the caretaking until balance of downpayment has been made. "The mortgage to be given by the buyers shall contain a grove care and cultivation clause." A deed dated May 30, 1945, acknowledged June 7, 1945, and recorded June 12, 1945, from Mary A. Harrington and B. G. Harring3on to decedent, conveyed 124 acres of the groves to decedent, of which 91.34 acres were planted with citrus trees and 32.66 acres were unplanted. The property conveyed to petitioner consisted of 134 acres, of which 89.45 acres were planted with citrus trees and 44.55 acres were unplanted. Mortgages dated May 30, 1945, acknowledged May 31, 1945, and *225 recorded June 9, 1945, were given to cover the deferred purchase price of $220,000. The mortgage covering the portion of the groves deeded to decedent totaled $105,000. The mortgage covering the portion of the groves deeded to petitioner totaled $115,000. At the time of the closing transaction of June 8, 1945, property taxes were prorated between the parties as of that date, and interest on the deferred balance of the purchase price began as of June 8, 1945. At the time the contract of sale was signed on March 12, 1945, all the Valencia oranges of the 1944-1945 crop had not been picked from the Harrington groves. The seller completed the picking of the 1944-1945 Valencia crop before the sale was consummated. The following is a statement of the number of boxes, picking and hauling expenses and net returns of the various citrus fruit produced by the Harrington groves and shipped to the American Fruit Growers, Inc., during the 1943-1944 and 1944-1945 seasons, and the tree box average for the latter season: 1943 - 1944
Season
Boxes
Picking and
Tree Box
Va-&ety
Shipped
Hauling
Net Returns
Average
Oranges
Seedless
7,672
$ 5,777.53
$ 18,260.44
Parsons
2,803
2,075.48
6,626.97
Pineapples
1,771
1,059.11
3,389.96
Valencias
22,942 1/4
15,515.07
55,216.58
Tangerines
10,186
9,934.50
26,883.42
Oranges
Temples
76
60.33
236.59
Grapefruit
10
.50
15.50
Total
45,460 1/4
$34,422.52
$110,629.46
1944 - 1945
Season
Oranges
Hamlins
10,002
$ 367.61
$ 21,804.81
2.18
Parsons
5,380
240.71
11,728.35
2.18
Pineapples
757
1,777.64
2.35
Valencias
25,870
894.42
65,755.26
2.54
Tangerines
9,319
276.31
26,764.28
2.87
Total
51,328
$ 1,779.05
$127,830.34
*226 Grapefruit sales not handled by American Fruit Growers, Inc. were not available, but were estimated to be 8,910 boxes for each of the seasons 1943-1944 and 1944-1945. The following schedule shows the variety of fruit, boxes of fruit produced by the grove, number of boxes sold, picking and hauling or harvesting expense, net returns, and on-the-tree averages, for the 1945-1946 season from the Harrington groves: Ralph E. Day
Boxes of
Boxes of
Fruit
Fruit
Cost of
Tree Box
Variety
Produced
Sold
Harvesting
Net Returns
Average
Hamlins
2,318
2,297
$ 512.70
$ 3,957.20
1.71
Parsons
1,193
1,174
352.80
2,250.62
1.89
Pineapples
5,888
5,841
2,346.04
10,910.10
1.85
Valencias
18,349
18,336 1/2
5,427.12
59,170.67
3.22
Temples
39
38
13.45
75.85
1.94
Total Oranges
27,787
27,686 1/2
$ 8,652.11
$ 76,364.44
Grapefruit
4,305
3,750
126.66
2,647.14
.61
Tangerines
200
190 1/2
110.02
288.08
1.44
Total All Fruit
32,292
31,627
$ 8,888.79
$ 79,299.66
Mrs. Ernestine B. Day
Hamlins
4,954
4,915
$ 557.79
$ 8,261.41
1.67
Pineapples
304
299
121.60
606.81
2.00
Valencias
11,939
11,957
3,560.98
39,172.27
3.28
Total Oranges
17,197
17,171
$ 4,240.37
$ 48,040.49
Grapefruit
6,086
5,256
1,444.43
3,680.77
.60
Tangerines
11,415
11,448 1/2
6,360.20
22,044.82
1.93
Total All Fruit
34,698
33,875 1/2
$12,045.00
$ 73,766.08
Total Both Groves
66,990
65,502 1/2
$20,933.79
$153,065.74
*227 The tree count on the Harrington groves in the spring of 1947 was 12,468 trees, as follows: Bearing orange trees
9,198
Nonbearing orange trees
200
Tangerine trees
1,881
Grapefruit trees
1,189
The trend in fruit prices during 1944-1945 season by months was as follows: Equivalent Prices of Fruit on the Tree Per Box All Methods of Sale Early and
Late
Seed-
Mid-
Type (Va-
less
Seeded
summer
lencia)
Grape-
Grape-
Month
Oranges
Oranges
fruit
fruit
October
$2.12
$1.26
$1.27
November
1.90
1.62
1.60
December
1.97
1.66
1.63
January
1.90
1.65
1.64
February
2.11
$2.21
1.83
1.81
March
2.16
2.38
1.95
1.95
April
2.62
2.05
1.99
May
2.70
2.05
2.02
June
2.63
1.95
1.91
July
Season
Average
$2.03
$2.51
$1.76
$1.76
Season averages of Florida citrus fruit on the tree for the seasons from 1933 through 1946 were as follows: Season Average of Fruit Prices Equivalent Prices of Fruit on the Tree Per Box All Methods of Sale ORANGES
GRAPEFRUIT
Early and
Seed-
Season
Midsummer
Late
less
Seeded
1933-34
$ .72
$1.20
$ .82
$ .60
1934-35
.75
1.16
.44
.32
1935-36
1.18
1.21
.98
.66
1936-37
1.13
1.92
.79
.37
1937-38
.75
.58
.66
.55
1938-39
.44
.82
.28
.20
1939-40
.46
.62
.55
.33
1940-41
.64
.98
.43
.29
1941-42
.90
1.35
.73
.56
1942-43
1.47
2.02
1.04
.85
1943-44
1.61
2.06
1.35
1.28
1944-45
1.98
2.45
1.76
1.67
1945-46
2.09
2.67
1.33
1.23
*228 Total operating cost per acre for citrus groves averaging over 10 years of age throughout the State of Florida was $137.61 for the 1945-1946 season. The normal operation of citrus groves requires two fertilizations prior to mid-March. During the subsequent development of citrus fruit a bud first appears on the trees and then opens into a blossom. As the petals of the blossom drop, small citrus fruit appears. Normally citrus groves bloom anywhere from February 15 to April 15. During the months of June and July a considerable portion of the small fruit drops. After that has occurred, the fruit is considered to be permanently "set" or adhered to the tree. Prior to the time the citrus crop is matured and harvested it is subject to loss from drought and freeze. The freeze danger period usually ends at the end of March. The months in which various citrus fruits usually attain maturity or full value and the number of months each type of fruit usually takes in maturing is as follows: Month Attains
Number of
Maturity or
Months in
Full Value
Maturing
* Early oranges
October
8
** Midseason oranges
December
10
*** Late oranges
February
12
Temples (oranges)
December
10
Tangerines
December
10
Grapefruit
November
9
Mixed kinds and
varieties
December
10
*229 In the income tax returns filed for decedent for the taxable period January 1, 1946 to May 2, 1946, and in the income tax return filed for petitioner for the taxable year 1946, the total purchase price of the citrus groves was allocated as follows: Land
$ 23,222.70
Fruit
75,000.00
Trees
222,000.00
Total
$320,222.70
The allocation of $75,000 to cost of fruit on the trees at the time of purchase was divided equally between petitioner and decedent. For the taxable year 1945 decedent deducted as cost of citrus fruit sold during that year the amount of $5,579.12. For the taxable period January 1, 1946 to May 2, 1946 there was reported in his income tax return a deduction of $31,920.88 as cost of citrus fruit sold during that period. The total of these amounts represents one-half of the $75,000 allocated by petitioner and decedent to the cost of the citrus crop on both their groves at the time of purchase. Petitioner deducted $37,500 on her income tax return for the taxable year 1946 as cost of citrus fruit sold during that year. *230 This amount represents one-half of the $75,000 allocated by petitioner and decedent to the cost of the citrus crop on both their groves at the time of purchase. Of the $320,000 paid for the Harrington groves, $262,500 is allocable to land and trees and $57,500 to the growing crop. The cost of the growing crop is allocable one-half to the groves deeded to petitioner and one-half to the groves deeded to decedent. Opinion Both parties agree that the lump-sum purchase price of $320,000 paid by petitioner and decedent for the Harrington groves exceeded the fair market value of the land and trees alone, taking into account their long-run earning potential. Respondent does not question the voluntary arm's length nature of the purchase negotiations. In these circumstances, the total price is some reflection of the true fair market value for the land, the trees and the undeveloped citrus crop as of March 12, 1945, the date of purchase. See , certiorari denied . It necessarily follows that at least some part of that price is allocable to the immature crop as its cost and hence must be *231 offset against amounts realized from its subsequent sale in determining the taxable gain thereon. . See . The only question is how much. Petitioner no longer contends for a total allocable crop cost of $75,000 as offset by her and decedent on their tax returns. She would accept the figure of $61,000 computed by the opinion witness who testified on her behalf at the hearing. Respondent's witness, on the other hand, concluded that only $9,627 of the purchase price constituted its allocable basis. On the entire record, we have found that the immature crop in the Harrington groves had a combined allocable cost of $57,500 at the time of purchase by petitioner and decedent. This finding disposes of the controversy. Decisions will be entered under Rule 50. Footnotes
*. Consist of the Hamlin and Parson Brown variety. ↩
**. Consist of Pineapple variety. ↩
***. Consist of the Valencia variety.↩